**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ANDREW TANGEN,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION No. 1-26-cv-2541** |
| | § | |
| **LUKAS SIMIANER and** | § | |
| **PATRIOT CLAIMS, LLC d/b/a** | § | |
| **VETCLAIMS.AI,** | § | |
| | § | |
| ***Defendants.*** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Andrew Tangen ("**Plaintiff**" or "**Mr. Tangen**") files this Original Complaint against Defendants Lukas Simianer ("**Simianer**") and Patriot Claims, LLC d/b/a VetClaims.ai ("**VetClaims**") (collectively, "**Defendants**") on personal knowledge as to all allegations regarding himself and on information and belief as to all others as follows:

## I. PRELIMINARY STATEMENT

1. In the fall of 2025, a veteran walked into the Veterans Assistance Commission of Lake County, Illinois ("**VACLC**"). He told the Superintendent, Plaintiff Andrew Tangen, that a woman who claimed she worked for VetClaims.ai asked him for $1,250 to file a VA claim he could file for free.

2. Mr. Tangen checked. He found that VetClaims held no accreditation from the Department of Veterans Affairs. He therefore referred the matter to the Illinois Attorney General for investigation.

3. Mr. Tangen said nothing about the referral in public. He handed the matter to the authorities and stepped aside.

4. Mr. Tangen is an Illinois-licensed attorney, a VA-accredited representative, the elected VACLC Superintendent, and the President of the National Association of County Veterans Service Officers ("**NACVSO**"). He spends his career helping veterans obtain their earned benefits at no charge. Reporting improper solicitations to the authorities is part of that job.

5. The report Plaintiff filed was in January 2026. It included the information he gathered, and went to the Illinois Attorney General's Military and Veterans Rights Bureau (the "**MVRB**") for independent review. That referral ended his role.

6. Months later, Defendants told a national audience that Mr. Tangen was corrupt. On or about June 4, 2026, Simianer published a post on social media naming Mr. Tangen, listing his professional credentials, and accusing him of having "backed fraudsters from his government email to maintain …[a] monopoly." The accusation was false when Simianer published it. It remains online.

7. Mr. Tangen denied the accusation and posted the government email showing that he had reported VetClaims to the Attorney General. Simianer publicly called that email "manufactured."

8. Simianer's commercial aim is plain. He attacked the Veterans of Foreign Wars ("**VFW**"), Disabled American Veterans ("**DAV**"), The American Legion, and NACVSO as a "monopoly." He singled out Plaintiff as NACVSO's President. He then pointed veterans to VetClaims, which sells the same services as the agencies he attacked for a fee.

9. Simianer did not stop at one post. For weeks he tagged and taunted Mr. Tangen across social media platforms, naming him and NACVSO, and boasting that he receives "42.2M impressions every month." Defendants have never corrected, retracted, or apologized.

10. The accusations attack the honesty on which Mr. Tangen's life's work depends. He brings this suit to clear his name, recover the damages allowed by law, and have the statements identified in this Complaint taken down.

## II. PARTIES

11. Plaintiff Andrew Tangen is a natural person domiciled in Lake County, Illinois and is a citizen of Illinois.

12. Defendant Lukas Simianer is a natural person domiciled in Texas and is a citizen of Texas. He is the founder and Chief Executive Officer of Defendant Patriot Claims, LLC. Simianer may be served with process at 601 E Pecan Street, Pflugerville, Texas, 78660 or wherever he may be found.

13. Defendant Patriot Claims, LLC d/b/a VetClaims.ai is a Texas limited liability company. Patriot Claims is member-managed, and Defendant Lukas Simianer is its sole member and managing member. Simianer is a citizen of Texas. Accordingly, Patriot Claims is a citizen of Texas for purposes of 28 U.S.C. § 1332 and is not a citizen of Illinois. VetClaims may be served through its registered agent, Registered Agents Inc., 5900 Balcones Drive, Suite 100, Austin, Texas 78731.

## III. JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff Andrew Tangen is a citizen of Illinois. Defendant Lukas Simianer is a citizen of Texas. Defendant Patriot Claims, LLC d/b/a VetClaims.ai is a Texas limited liability company whose sole member, Simianer, is a citizen of Texas; Patriot Claims is therefore also a citizen of Texas for diversity purposes. The amount in controversy exceeds $75,000, exclusive of interest and costs. Complete diversity exists between Plaintiff and all Defendants.

15. This Court has personal jurisdiction over Simianer because he is domiciled in Texas and resides within the Western District of Texas.

16. This Court has personal jurisdiction over VetClaims because it is organized under Texas law, is member-managed by Simianer in Texas, maintains its business operations in the Western District of Texas, and conducts business from Texas. Specific jurisdiction independently exists because Plaintiff's claims arise from conduct VetClaims carried out through Simianer in Texas, including the publication, republication, and amplification of the Challenged Publications for VetClaims' benefit.

17. Venue is proper in the Western District of Texas under 28 U.S.C. § 1391(b)(1) because all Defendants reside in Texas and both are subject to personal jurisdiction in this District, and under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Simianer resides and operates VetClaims from the Austin area, and the Challenged Publications were published, republished, and amplified from Texas in connection with VetClaims' business. Travis County lies within the Austin Division of the Western District of Texas. *See* 28 U.S.C. § 124(d)(1).

## IV. CONDITIONS PRECEDENT AND REQUESTS FOR CORRECTION OR RETRACTION

18. To the extent any condition precedent applies, all conditions precedent have occurred or were performed. *See* Fed. R. Civ. P. 9(c).

19. Plaintiff made timely written requests for correction, clarification, or retraction to both Defendants. On August 21, 2026, Plaintiff served VetClaims with a written request. On September 1, 2026, Plaintiff served Simianer with the same request. Each request identified the false and defamatory statements, the time and place of publication then known, the defamatory meaning, and the circumstances giving rise to that meaning.

20. Defendants did not publish a correction, clarification, or retraction of the Challenged Publications. Plaintiff will give any later correction, clarification, or retraction whatever effect applicable law requires. Plaintiff pleads these facts to preserve compliance with any notice, correction, retraction, mitigation, or condition-precedent requirements that applicable law may impose.

## V. FACTUAL BACKGROUND

### A. The Context: Claim Predators And Consumer Protection In The VA-Benefits Space

21. Veterans seeking disability compensation and other VA benefits may receive help from VA-accredited attorneys, agents, and veterans service organizations. Many of those organizations and local veterans offices provide that help for free. Accreditation exists to assure veterans that they are dealing with qualified representatives.

22. Federal law limits who may act as an agent or attorney in preparing, presenting, or prosecuting a VA-benefits claim. A person may not do that work without accreditation from the Department of Veterans Affairs. *See* 38 U.S.C. § 5901(a).

23. Federal law also limits when fees may be charged. Agents and attorneys generally may not charge or receive fees for claims-representation services provided before the claimant receives notice of the initial decision. *See* 38 U.S.C. § 5904(c)(1). If the initial claim is denied, accredited agents and attorneys may charge fees up to 20 percent of past-due benefits, and have such fees treated as reasonable or eligible for direct payment. *See id.* § 5904(a)(5), (d).

24. The VA warns veterans about "claims predators" and "claim sharks." Those are terms used in consumer-protection discussions, not legal classifications for purposes of this Complaint. The warnings address aggressive or misleading solicitations, promises of faster processing or higher ratings, and unclear fee arrangements.

25. Veterans dealing with disability, financial pressure, and an unfamiliar benefits system are targets for claims sharks. The VA, therefore, urges veterans to verify accreditation, understand any fee before agreeing to it, and seek help from accredited representatives.

### B. Plaintiff's Public Service That Protects Veterans And The Integrity Of The Claims Process.

i. Plaintiff's Qualifications And No-Cost Service To Veterans.

26. Plaintiff has spent his career in veterans' advocacy, veterans-benefits representation, and public service. He is a VA-accredited representative and has served since 2017 as Superintendent of the VACLC. He helps veterans and their dependents obtain earned benefits and oversees veterans-assistance services in Lake County.

27. Since July 2025, Mr. Tangen served as President of NACVSO, a national association of approximately 3,100 county veterans-service officers who assist veterans develop claims and move from military to civilian life. He previously served as NACVSO's Vice President and testified before Congress on veterans' health care and benefits legislation.

28. Mr. Tangen is also an Illinois-licensed attorney and a former United States Navy officer who attained the rank of Lieutenant Commander. Before becoming Superintendent, he served as Clinical Team Lead at the Veterans Legal Support Center & Clinic, where he handled VA-benefits matters from intake through appeal.

ii. The No-Cost VSO Model Preserves Veteran Choice.

29. Veterans should be able to get competent, accountable help with a VA claim without being pushed into a confusing or improper fee arrangement. VA-accredited representatives, county veterans-assistance offices, and veterans service organizations commonly help veterans for free.

30. Mr. Tangen does not charge veterans for his work. He became a county veterans-service officer to help veterans without taking a share of their recovery.

31. NACVSO's members likewise represent veterans without charging them.

32. County veterans-service officers hold a unique place in that system. They are the only representatives who may carry cross-accreditation with several recognized veterans service organizations, including The American Legion, VFW, and DAV. A veteran can therefore work with the same government veterans-service officer ("**VSO**") while choosing the organization through which the claim is filed. About 85% of VA-benefits claims nationwide are filed through government VSOs.

iii. Consumer Protection and Reporting Are Part Of Plaintiff's Ordinary Responsibilities.

33. Veterans routinely come to the VACLC office with questions and reports about claims-assistance offers. Many report being asked to pay for assistance to prepare or pursue a VA-benefits claim.

34. When a report raises a question about accreditation or fees, Mr. Tangen checks available accreditation records, reviews the company and its fee arrangement, and, when appropriate, refers the matter to government authorities responsible for deciding whether any law was broken. Protecting the integrity of that process is part of his duties.

35. The referral typically ends his involvement. He does not subpoena records, decide violations, or direct enforcement. Unless an agency follows up, he hears nothing further.

36. Mr. Tangen works regularly with the VA, the VA Office of Inspector General, state authorities, and members of Congress on deceptive practices that harm veterans. He helped push for Illinois' veterans consumer-fraud protections. Referring questionable solicitations for independent review is part of his ordinary work.

**C. Mr. Tangen Refers A Solicitation To The Illinois Attorney General.**

37. In the fall of 2025, a veteran came to the VACLC office. He reported that a woman who identified herself as a VetClaims.ai employee had offered, for about $1,250, to help him with an initial VA-benefits claim. Mr. Tangen had never heard of VetClaims before that report.

38. He reviewed VetClaims' website and searched available VA accreditation records for the company and the individual the veteran named. VetClaims was not VA-accredited.

39. An unaccredited company was seeking payment to help with an initial claim. That is the stage at which federal law restricts claims-representation fees.

40. In January 2026, Mr. Tangen sent the veteran's report and the information he had gathered to the MVRB. The referral email records him reporting conduct associated with VetClaims for government review. It does not show him supporting, protecting, or "backing" VetClaims or anyone connected to it.

41. Mr. Tangen joined a few virtual follow-up meetings with the MVRB. He took no further investigative role and does not know the status of the review.

**D. While Authorities Reviewed The Referral, VetClaims Continued to Market Paid Claims Services.**

42. VetClaims operates on a different model. Since 2024, Simianer has run VetClaims as a for-profit business whose revenue comes from fees veterans pay to have their VA-benefits claims processed.

43. VetClaims is in the business of selling those services to veterans. Simianer, its founder, Chief Executive Officer, and principal promoter, sells them on the company's behalf. Neither Defendant earns anything from a veteran who gets the same help for free.

44. Simianer promotes himself as the "Combat Capitalist" and distinguishes VetClaims from businesses he describes as "claim sharks."

45. VetClaims' March 12, 2026 Terms of Service listed a $1,250 paid-in-full price and a $1,500 installment plan, and stated that VetClaims was "not a subscription service." The March Terms also set out refund and performance guarantees, including eligibility requirements and a thirty-day "File-Ready" guarantee.

46. By June 8, 2026, the headline prices were the same, but the terms governing payment, refunds, and guarantees became more conditional. The June Terms allow pricing to be disclosed at checkout, in an order confirmation, or in other written disclosures. They permit added eligibility determinations, acknowledgments, elections, or waivers before a guarantee applies. They allow refunds to be reduced by payment-processing fees. They also drop the March option that let a qualifying customer take a refund under the File-Ready Guarantee while VetClaims kept working at no extra charge.

47. Those terms are significant for at least two reasons. First, they show Defendants' commercial stake. VetClaims earns nothing unless a veteran pays, so every veteran served for free by a county veterans-service officer or a veterans service organization represents revenue Defendants do not receive. Second, Defendants tightened the economics of their fee model within days of publishing the Challenged Publications. They did so while they were publicly attacking the free alternative and its leadership.

**E. Defendants Falsely Claim The Reporter Is The Wrongdoer.**

i. <u>Defendants Publish The Challenged Publications.</u>

48. By early June 2026, Defendants began publicly targeting Plaintiff.

49. On or about June 4, 2026, Simianer published a public LinkedIn post naming Mr. Tangen, listing his professional credentials, and addressing the leadership of several national veterans organizations. Simianer wrote, in relevant part:

To any sitting leader at the DAV … The American Legion, Veterans of Foreign Wars (VFW), or NACVSO specifically the outspoken Mr. Andrew Tangen, JD, MBA, MS **who has backed fraudsters from his government email to maintain the monopoly**.

50. The statement that Plaintiff "has backed fraudsters from his government email to maintain the monopoly" is referred to herein as the "**Defamatory Statement**."

51. After Mr. Tangen posted the referral email, Simianer replied, "ah yes, the manufactured email" (the "Fabrication Accusation"). In the same exchange, Simianer asked whether a FOIA request would show "how much you made off veterans," implying that Mr. Tangen secretly profited from veterans while using public office to block competition (the "Profit Implication").

52. Simianer republished the Defamatory Statement on X (formerly Twitter) and on Facebook. Simianer published the Fabrication Accusation and Profit Implication on LinkedIn. Each publication remains publicly available and searchable against Mr. Tangen's name.

53. The Defamatory Statement, Fabrication Accusation, and Profit Implication (together, the "Challenged Publications") were published to and read by third parties, and reached or were likely to reach the audience whose confidence Mr. Tangen's work depends on: veterans and their families, the membership and leadership of national veterans service organizations, VA and VA Office of Inspector General personnel, state attorneys general and county officials, the media, elected officials and their staffs, and the bar.

54. Each Challenged Publication is about Mr. Tangen. Simianer repeatedly named and tagged him, listed his credentials, identified NACVSO, and pointed to his government email.

55. Simianer set the personal accusation inside a broader attack on the VSO system. He addressed the sitting leadership of DAV, VFW, The American Legion, and NACVSO, then singled out Mr. Tangen as the leader who supposedly "backed fraudsters" to maintain a "monopoly."

56. That pairing tied Mr. Tangen to Defendants' larger message that established VSOs operate as corrupt "gatekeepers." Discrediting the leader discredited the free system he represents, and discouraged veterans from relying on established VSOs.

ii. <u>Defendants Knew The Challenged Publications Were False.</u>

57. Mr. Tangen did not misuse his government email or act to preserve any monopoly. He took a veteran's report, checked public accreditation records, referred the matter to the MVRB, answered limited follow-up questions, and left the rest to the responsible agencies. Defendants' accusations against him were false.

58. On or about June 4, 2026, Mr. Tangen responded to Simianer, denied the accusation, and identified the government email documenting his referral to the Illinois Attorney General.

59. Simianer's own accusation pointed to Mr. Tangen's "government email." That email was the January 2026 referral reporting VetClaims to the MVRB; the document Simianer cited as proof of corruption records a report to the authorities.

60. When Mr. Tangen produced the referral email, Simianer did not qualify, correct, or retract. He called it a "manufactured email." He identified no factual basis for his claim. He instead told the public that the exculpatory government record was fabricated.

61. Defendants have identified no source, witness, or document showing that Mr. Tangen backed fraudsters, fabricated a government email, or profited from the veterans he helps.

62. Before publishing, Defendants contacted no one — not Mr. Tangen, the VACLC, NACVSO, or the Illinois Attorney General's Office. Any one of them could have confirmed the

truth in a single inquiry. After Mr. Tangen denied the accusation and produced the email, Defendants still did not correct it.

63. Plaintiff does not rest actual malice on a failure to investigate alone. He relies on Defendants' reliance on the government email, the contrary document placed directly in front of Simianer, Simianer's decision to call that record "manufactured," and Defendants' continued publication afterward.

64. Simianer told readers that Plaintiff's supposed wrongdoing happened "from his government email." Either Simianer had that email when he published or he did not. If he had it, he had read a message reporting VetClaims to the Illinois Attorney General and told the public, falsely, that it showed Plaintiff "backed fraudsters." If he did not have it, he made a specific factual charge about the contents of a document he had never seen. Either way, he published a charge he knew he could not support.

iii. <u>Defendants Amplify And Repeat The Accusations.</u>

65. As VetClaims' Chief Executive Officer ("CEO"), Simianer pushed the Defamatory Statement beyond its original audience. VetClaims personnel liked, shared, and commented on the post and engaged Mr. Tangen directly, which widened its reach and made it appear corroborated. Simianer requested, directed, or encouraged that amplification through VetClaims' internal channels, facts that remain in Defendants' possession.

66. The campaign also sold VetClaims. Simianer published as VetClaims' founder, CEO, spokesperson, and promoter of its fee-based claims services. He directed readers to VetClaims, framed the dispute as "competition," promoted the $1,250 fee model, and urged veterans to engage and share. His audience was made up of actual and potential purchasers of the same services VetClaims sells. The Challenged Publications arose out of, and were made in connection with, the sale of those services.

67. Over approximately the next thirty-five days, Simianer published additional posts and comments that repeatedly tagged Plaintiff and tied him to the accusation. In one comment on his own post, Simianer tagged Plaintiff and wrote, "Where you at?"

68. Defendants continued the campaign after Mr. Tangen denied the corruption charge and produced the referral email that contradicted it.

69. Defendants have never published any correction, retraction, or apology, in any form, to any audience.

70. Simianer later said he was "exposing VSO's until they debate me" and claimed that his "donkey is more effective" than NACVSO and other veterans organizations.

71. Simianer also continued tagging Plaintiff in material that made it appear that Plaintiff and others were part of the problem behind veteran suicide.

iv. Defendants Used Plaintiff To Discredit the No-Cost VSO Structure And Injure His Reputation.

72. Defendants had a commercial motive to discredit Mr. Tangen and the institutions he represents. A veteran who gets competent claims help for free from a VSO has no reason to pay VetClaims.

73. Simianer's posts treat the two models as competitors. He accused established VSOs of protecting "power and revenue streams," repeatedly invoked "competition," cast those VSOs as a "monopoly" blocking veteran choice, positioned VetClaims as the paid solution, and directed his audience to VetClaims.ai.

74. He called out DAV, The American Legion, VFW, and NACVSO, then singled out NACVSO's President for a corruption charge. That pairing invited readers to treat Mr. Tangen's supposed corruption as evidence against the whole VSO structure.

75. The message served Defendants' business: convince veterans that free VSOs are corrupt gatekeepers protecting a "monopoly," weaken confidence in those organizations, and make VetClaims' paid alternative look better.

76. The campaign cast the public servant who reported it as the corrupt actor, and the fee-charging company as the veterans' champion. That story rests on a false premise: that Mr. Tangen used government authority to protect fraudsters.

77. Mr. Tangen's work depends on credibility with veterans, government agencies, county officials, congressional offices, colleagues, and the bar. An accusation that he used public office to shield fraudsters and then faked a government record strikes directly at that trust.

78. As a direct and proximate result of Defendants' conduct, Mr. Tangen has been forced to answer questions about the accusation from members of the media, senior federal and state agency officials, elected leaders and their staffs, and professional colleagues.

79. Mr. Tangen has suffered injury to his reputation for honesty, integrity, faithful public service, injury in his office and profession, and mental anguish. That injury is continuing, because the Challenged Publications remain publicly available and searchable against his name.

**F. The Challenged Publications Arose Out Of Defendants' Sale Of Paid Claims Services.**

80. Defendants sell services for money. VetClaims' revenue comes from the fees veterans pay it to prepare and pursue VA-benefits claims. Selling those services is the company's business. Running and promoting that business is Simianer's occupation. Neither Defendant has any other line of work at issue in this case.

81. Simianer published the Challenged Publications in his capacity as VetClaims' founder, Chief Executive Officer, and lead salesman. He published under his own name and under

VetClaims' banner, promoted himself as the "Combat Capitalist," and described the free VSO system as his "competition." He was selling while he published.

82. The Challenged Publications arose out of the sale of the services that VetClaims provides. Each one set the paid model against the free model and asked the reader to choose between them. Simianer promoted the $1,250 fee, directed readers to VetClaims.ai, and told them that the free alternative was run by a corrupt monopoly. Within days of publishing, Defendants revised the terms governing that same fee arrangement.

83. The intended audience was made up of actual and potential customers. Veterans and their families are the only people who buy what VetClaims sells, and Simianer addressed the posts to them. He tagged the veterans organizations whose members make up that same audience, urged readers to engage and share, and boasted that his posts draw "42.2M impressions every month."

84. These facts show that Defendants attacked Plaintiff and the no-cost VSO model while simultaneously promoting VetClaims' paid services to the same veterans who could obtain assistance at no charge through VSOs. Plaintiff relies on that commercial context as evidence of motive, audience, agency, and damages.

## VI. CLAIMS

### COUNT ONE: DEFAMATION – EXPRESS STATEMENTS (INCLUDING DEFAMATION *PER SE*) (AGAINST ALL DEFENDANTS)

85. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

86. Defendants are liable for defamation under the law applicable to Plaintiff's claims because they published false factual statements concerning Plaintiff to third parties with the requisite degree of fault, causing reputational and other legally cognizable injury. Plaintiff pleads

all available classifications and remedies, including defamation per se and presumed damages, to the extent recognized by applicable law.

87. Defendants published the Defamatory Statement and Fabrication Accusation to third parties. Defendants also republished the Defamatory Statement across multiple public platforms. Both statements are false.

88. The Defamatory Statement and Fabrication Accusation are defamatory on their face and in context. The Defamatory Statement charges Plaintiff with corruptly using his government office to protect fraudsters for an anticompetitive purpose. The Fabrication Accusation, made in direct response to Plaintiff's production of the referral email, charges him with fabricating a government record. The referral email is evidence that those accusations are false; no extrinsic fact is needed to supply their defamatory meaning.

89. Both statements concern Plaintiff and identify him unmistakably. Simianer named and tagged Plaintiff, listed his credentials, identified NACVSO, and expressly referred to his government email.

90. Both statements assert objectively verifiable facts, not protected opinion or rhetorical hyperbole. The First Amendment does not create a wholesale exemption for statements labeled as opinion; a statement remains actionable when a reasonable reader could understand it as asserting a false fact capable of being proved true or false. Courts also consider whether the language is loose, figurative, or hyperbolic and whether the publication's overall tenor negates the impression that the speaker was asserting actual facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–22 (1990).

91. Plaintiff does not sue over Simianer's insults or his general advocacy. He does not sue because Simianer called VSOs "gatekeepers," complained of a "monopoly," demanded a debate, or said his "donkey is more effective" than NACVSO.

92. The Defamatory Statement alleges a specific act ("back[ing] fraudsters"), through a specific instrument of public office (his "government email"), for a specific corrupt purpose (maintaining a "monopoly"). Records can show whether that email supported wrongdoers or reported them.

93. The surrounding context confirms the factual character of the accusations. When Plaintiff produced the government email, Simianer called it "manufactured." He then pointed to another supposed record, asking what a FOIA request would show about "how much you made off veterans." Both statements falsely claimed to rest on verifiable documents, even though Simianer made them during a combative public campaign.

94. Simianer did not attach a label to conduct his readers already knew about. A speaker who calls known conduct "corrupt" or "criminal" gives his view of facts the audience can weigh for itself. Simianer did the opposite. He told readers that a specific event occurred: that Plaintiff used a particular government email to back fraudsters.

95. Simianer also disclosed no facts underlying the charge that would allow readers to evaluate it independently. He named one supposed source, the government email, but said nothing about what it contained. The publication thus presented the accusation as resting on facts known to Simianer but undisclosed to his audience.

96. Framing the Profit Implication as a question does not change the factual message conveyed by the exchange. In context, the question suggested that records existed showing money

Plaintiff had taken from veterans. Plaintiff pleads the factual meaning conveyed to a reasonable reader.

97. Plaintiff does not concede that any heightened constitutional standard applies to any Challenged Publication. He said nothing in public about VetClaims before Defendants named him. He took no part in any public dispute about VetClaims' business, and he sought no public role in one. He reported a solicitation through an official channel and left the matter with the agency. Plaintiff pleads the fault element under every standard that could apply and satisfies the most demanding of them.

98. Plaintiff pleads fault in the alternative under Federal Rule of Civil Procedure 8(d)(2)-(3). If negligence or another ordinary fault standard governs, Defendants were at least negligent as to the truth of the accusations. They published specific charges of corruption and fabrication without contacting Plaintiff, the VACLC, NACVSO, or the Illinois Attorney General's Office. Any one of them could have shown that the government email documented a referral of VetClaims to the authorities. Defendants published anyway, and kept publishing after Plaintiff produced the record.

99. If the Court holds that the public-official, public-figure, or limited-purpose-public-figure standard governs any Challenged Publication, Plaintiff pleads that Defendants published with actual malice, meaning knowledge of falsity or reckless disregard for the truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Simianer cited Plaintiff's government email as evidence of corruption. That email reported VetClaims to the authorities. When Plaintiff produced it, Simianer offered no contrary evidence and branded the record "manufactured." Defendants then kept publishing. These facts support that Defendants knew the accusations were false or entertained serious doubts about their truth.

100. The same Defamatory Statement and Fabrication Accusation are also defamatory *per se* because they directly attack Plaintiff's honesty, integrity, and fitness in the offices and professions he holds. Accusing a licensed attorney, VA-accredited representative, and public servant of abusing government authority to shield fraudsters and fabricating an official record strikes at the trust and professional fitness those roles require. Plaintiff therefore pleads that the statements are defamatory *per se*, or otherwise actionable without proof of special pecuniary loss, to the extent applicable law recognizes those classifications.

101. Plaintiff seeks actual, general, nominal, and presumed damages to the extent permitted by applicable law and the First Amendment. He separately pleads actual injury to reputation and mental anguish. Nothing in this count depends solely on a presumption of injury.

**COUNT TWO: DEFAMATION BY IMPLICATION (PLEADED IN THE ALTERNATIVE) (AGAINST ALL DEFENDANTS)**

102. Plaintiff incorporates each of the foregoing paragraphs as if stated in full herein and pleads this count as an alternative theory arising from the same Challenged Publications.

103. The Challenged Publications, read as a whole and in context, conveyed false and defamatory factual meanings through implication, sequence, and juxtaposition, including meanings not stated in a single sentence. The First Amendment does not immunize a publication merely because a factual assertion is indirect or couched as opinion; liability remains constitutionally permissible when a reasonable reader could understand the publication to assert a provably false fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-22 (1990). Plaintiff pleads those meanings as an alternative basis for liability to the extent applicable law recognizes defamation by implication.

104. First, read as a whole, the June 4 post and the exchange beneath it convey that Plaintiff used his public office, and an identified government email, to protect people who were

cheating veterans, and falsely accused Plaintiff of doing so to preserve a monopoly for himself and NACVSO.

105. Second, the same exchange conveyed the Profit Implication: that Plaintiff personally profited from veterans and used his public office to protect that financial interest from competition. Simianer accused Plaintiff of backing fraudsters; Plaintiff then produced the government email; Simianer called the email "manufactured" and immediately asked what a FOIA request would show about "how much you made off veterans." Read in that sequence, the statements connected the corruption charge to an asserted personal financial motive. That implication is false. Plaintiff receives no fee, commission, contingency, referral payment, or share of any veteran's benefits and has never taken anything of value from a veteran he has helped. His only compensation is the fixed public salary he receives as VACLC Superintendent.

106. The sequence made those implications concrete rather than speculative. Simianer first stated as fact that Plaintiff "has backed fraudsters," identified Plaintiff's government email as the supposed basis for that charge, and then responded to the actual email by calling it "manufactured." He immediately followed that accusation with a question about "how much you made off veterans." In one continuous exchange, Simianer thus linked corruption, fabrication of government evidence, and personal financial gain, conveying that records existed to substantiate those charges when no such factual basis existed.

107. The meanings assert objectively verifiable facts, not protected opinion or rhetorical hyperbole. Whether Plaintiff used his office to protect wrongdoers, fabricated a government record, received payments from veterans, or was the subject of records showing such payments can be proved true or false. The First Amendment does not create a wholesale privilege for

statements that a reasonable reader would understand as asserting actual facts. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–22 (1990).

108. Plaintiff pleads the same alternative fault standards and damages theories set out in Count One. If an ordinary fault standard applies, Defendants were at least negligent as to the false implied meanings for the reasons alleged above.

109. To the extent the public-official, public-figure, or limited-purpose-public-figure standard governs Count Two, Defendants published the foregoing defamatory meanings with actual malice because they knew those meanings were false or subjectively entertained serious doubts about their truth. Simianer invoked the government email as proof, was confronted with the email showing a referral to the Illinois Attorney General, called that contrary record "manufactured," identified no factual basis for the asserted personal-profit motive, and continued publishing. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668, 692 (1989) (recognizing that a publisher's state of mind may be proved through circumstantial evidence and that purposeful avoidance of the truth is materially different from a mere failure to investigate).

## VII. VETCLAIMS' LIABILITY

110. Simianer is VetClaims' founder and, at all relevant times, served as its CEO, managing agent, and public spokesperson. Simianer personally authored and published the Challenged Publications and therefore bears individual liability for his own tortious publications regardless of his corporate role.

111. VetClaims is liable for the Challenged Publications and the republications that followed under respondeat superior. Simianer published within the course and scope of his

authority, while addressing VetClaims' business model, and to advance VetClaims' interest in selling paid services instead of free representation.

112. The campaign tied the accusations to VetClaims' business. Simianer promoted the fee model, directed readers to VetClaims, framed the dispute as "competition," and urged the veteran audience to engage and share. The publications concerned the services VetClaims sells, reached the people who buy them, and were meant to win their business.

113. VetClaims also ratified the campaign. Its personnel amplified and engaged with the publications. The company did not disclaim, correct, or remove the accusations. It kept the promotional benefit after Mr. Tangen disputed the charge and produced contrary proof.

## VIII. DAMAGES

114. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered actual damages for injury to his reputation, professional standing, and mental well-being, including past and future mental anguish. Plaintiff further seeks nominal and presumed damages to the extent permitted by applicable law and the First Amendment.

115. Reputational injury here is not measured by economic loss alone. Defendants targeted a professional community in which credibility and trust determine whether Mr. Tangen can do his job, and accused him of corruptly abusing public office and faking government evidence. The accusations remain publicly available and searchable under his name.

116. The campaign reached a wide audience. Simianer claimed "42.2M impressions every month." Users reacted, commented, and reposted on LinkedIn and Facebook. Third parties questioned Mr. Tangen's compensation. The accusations reached officials, colleagues, veterans, and others whose view of his integrity matters to his professional and personal reputation. Their continued availability compounds the harm.

117. The injury is specific and provable. Mr. Tangen has had to answer the accusations in conversations with reporters, with senior federal and state agency officials, with elected officials and their staffs, and with colleagues in NACVSO and the county veterans-service community. He has suffered humiliation, anxiety, and mental anguish. Because the publications remain searchable under his name, every new professional contact may begin with them.

## IX. PUNITIVE OR EXEMPLARY DAMAGES

118. Plaintiff seeks punitive or exemplary damages to the extent permitted by applicable law. Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Plaintiff's rights and the known or obvious risk of severe reputational harm.

119. Defendants deliberately accused a public servant of corruption, called the government record that contradicted the accusation "manufactured," invoked Simianer's claimed audience of millions, and continued the campaign after receiving contrary proof.

120. Those acts support the inference that Simianer specifically intended to cause substantial injury to Plaintiff's reputation and, as VetClaims' founder and CEO, used the campaign to advance VetClaims' commercial position.

121. The constitutional actual-malice standard and any state-law standard governing punitive or exemplary damages are distinct inquiries. Plaintiff pleads facts supporting both to the extent applicable. Plaintiff's constitutional actual-malice allegations rest on Defendants' knowledge of falsity or reckless disregard for truth; his punitive-damages allegations additionally rest on the deliberate nature of the accusations, their continued publication after contrary proof, the scope of the campaign, and Defendants' use of the accusations to advance VetClaims' commercial position.

## X. REQUEST FOR PERMANENT INJUNCTIVE RELIEF

122. If the Court finally determines that one or more of the Challenged Publications, or any publication later added to the pleadings, is false and defamatory, Plaintiff requests a narrowly tailored permanent injunction requiring Defendants to remove each adjudicated statement from any account, platform, or website within their possession, custody, or control.

123. Plaintiff seeks no prior restraint. He does not ask the Court to enjoin future speech, including criticism, opinion, truthful statements, or statements that have not been tried and found defamatory.

124. Plaintiff further requests that any such injunction identify each adjudicated statement with specificity, bind only persons legally subject to the judgment, and extend no further than necessary to remedy the adjudicated wrong.

## XII. JURY DEMAND

125. Plaintiff demands a trial by jury on all issues so triable. *See* Fed. R. Civ. P. 38.

## XIII. PRAYER FOR RELIEF

126. For these reasons, Plaintiff Andrew Tangen respectfully requests that judgment be entered in his favor and against Defendants, jointly and severally to the extent permitted by law, and that Plaintiff recover:

a. actual and general damages, including damages for injury to reputation and for past and future mental anguish;

b. nominal and presumed damages to the extent permitted by applicable law and the First Amendment;

c. punitive or exemplary damages to the extent permitted by applicable law;

d. narrowly tailored permanent injunctive relief as set out in Section X;

e. pre-judgment and post-judgment interest at the maximum lawful rates;

f. costs of court; and

g. all other relief, at law or in equity, to which Plaintiff is justly entitled.

Dated: September 15, 2026

Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By: *_/s/Joshua H. Harris_*

William A. Brewer III
State Bar No. 02967035
wab@brewerattorneys.com
Joshua H. Harris
State Bar No. 24127306
jharris@brewerattorneys.com
Noah B. Peters
State Bar No. 24147168
nbp@brewerattorneys.com
Jordon B.V. Smith
State Bar No. 24143774
jsmith@brewerattorneys.com
Amir I. Saada
State Bar No. 24149742
ais@brewerattorneys.com
1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF**